UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| JOE N. PRATT INSURANCE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-07-07 |
| | § | |
| DONNA EASLEY DOANE, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION & ORDER

Pending before the Court are Defendants Donna Easley Doane d/b/a Easley Insurance Agency, Judy Turner, Donald Easley, and Margaret Easley's (collectively, "Easley Defendants") Motion for Partial Summary Judgment (Dkt. No. 53) and Supplemental Motion for Partial Summary Judgment (Dkt. No. 90).[1]  Having considered the motions, responses, replies, record, and relevant law, the Court finds that the motions should be granted in part and denied in part.

Background and Procedural History[2]

This action stems from the Easley Defendants' alleged theft and/or misuse of Plaintiff Joe N. Pratt Insurance's ("Pratt" or "Plaintiff") financial and business information.  Pratt accuses the Easley Defendants of conspiring to steal and stealing proprietary information, including customer lists and Pratt's business plan, in the period leading up to Donna Easley Doane's ("Doane") resignation.  Pratt alleges that, with the aid of this information, Doane started her own insurance

---

[1] The Easley Defendants now request summary judgment on all of the claims against them.

[2] The Easley Defendants filed numerous objections to portions of Pratt's summary judgment evidence (Dkt. No. 59). The Court has considered the evidence proffered, the objections thereto, and Pratt's response. While some objections have merit, to the extent the Court has regarded portions of the evidence as admissible and necessary to the resolution of particular summary judgment issues, it hereby overrules the Easley Defendants' objections. To the extent such evidence has not been relied on by the Court, the remaining objections are denied as moot.

agency, which has profited from the information she took at Pratt's expense.

A more detailed summary of the events giving rise to this litigation is set forth in a March 20, 2008 Order granting in part and denying in part Defendants' motions to dismiss (Dkt. No. 35). Four of Pratt's claims against the Easley Defendants survived the Court's March 20 Order: (1) that the Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; (2) that the Defendants misappropriated Pratt's trade secrets; (3) that the Defendants breached fiduciary duties; and (4) that the Defendants tortiously interfered with contractual and prospective contractual relations. (Dkt. No. 35 at 25). Pratt's breach of contract claim against Judy Turner ("Turner") also survived. (*Id.*). Defendants now seek summary judgment as to each of the above-identified claims. Additional facts relevant to the adjudication of this matter are developed below as necessary.

## Standard of Review

A motion for summary judgment shall be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999). In considering a motion for summary judgment, the Court construes factual controversies in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists. *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998). If the burden of proof at trial lies with the nonmovant, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden is on the movant to convince the court that no genuine issue of material fact exists as to the claims asserted by the nonmovant, but the movant is not required to negate elements

2

of the nonmovant's case. *Id.* at 323.

The nonmoving party may not rest solely on its pleadings. *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992). For issues on which the nonmovant will bear the burden of proof at trial, that party must produce summary judgment evidence and designate specific facts which indicate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). Needless to say, unsubstantiated assertions are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1429 (5th Cir. 1996) ("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the nonmoving party must present "significant probative" evidence indicating that there is a triable issue of fact. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994). If the evidence rebutting the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986).

## Discussion

### A. Pratt's Claim Under the CFAA

A charging party can recover monetary damages under the CFAA by establishing a violation of one of the statute's substantive provisions, set forth in section 1030(a),[3] and the existence of at

---

[3]The CFAA was amended in 2008 and portions of the Act have been renumbered. Since the Defendants' conduct occurred—and the case was filed—prior to the effective date of the amendments, all citations refer to the pre-2008 Amendments version of the CFAA.

least one of the five numbered clauses of subsection 1030(a)(5)(B).[4]  *See* 18 U.S.C. § 1030(g); *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1156-57 (5th Cir. 2006).

Although not made explicitly clear, Plaintiff appears to bring its CFAA claim under § 1030(a)(4).  (Dkt. No. 17 ¶¶ 97-98 (paraphrasing 18 U.S.C. § 1030(a)(4)).  Section 1030(a)(4) authorizes civil suit of a defendant who "knowingly and with intent to defraud, accesses a protected computer *without authorization, or exceeds authorized access*, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."  18 U.S.C. § 1030(a)(4) (emphasis added).

As an initial matter, Pratt has not filed any substantive response to the Easley Defendants' motion as it pertains to its CFAA claim.  In response, Pratt merely states that "[w]ith the possible exception of Plaintiff's Computer Fraud and Abuse Act claim . . . there are . . . genuine issues . . . ."  (Dkt. No. 56 at 14).  By not presenting any legal argument, much less one with factual support, Pratt has essentially failed to respond, and the Court deems this portion of the motion as unopposed.

However, for the sake of completeness, and with acknowledgment that motions for summary judgment should not be granted merely based on a lack of opposition, *John v. Louisiana Bd. of Trs. for State Colls. & Univs.*, 757 F.2d 698, 707-10 (5th Cir. 1985), the Court finds the Easley Defendants' argument to be meritorious.  As the Easley Defendants accurately state, Pratt's theory of liability "appears to be that Ms. Doane's and Ms. Turner's authorization to use its computers

---

[4] Section 1030(a)(5)(B)(i) punishes a defendant who causes "loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value." 18 U.S.C. § 1030(a)(5)(B)(i).

implicitly excluded unfairly competitive uses; thus it would argue that such uses lacked authorization or were in excess of authorization." (Dkt. No. 54 at 6). In other words, Pratt does not contend that Doane or Turner "hacked" or otherwise broke into Pratt's computer system; rather, Pratt's complaint is that Doane and Turner *misused* the business information they gathered from Pratt's system, which they were undoubtedly authorized to access. The Court concludes that such a theory cannot support a claim under the CFAA.

Several courts have confronted the issue of whether § 1030(a)(4) applies to defendants who have accessed a computer with authorization but subsequently used the information for an improper or unintended purpose. In *Condux International, Inc. v. Haugum*, a case relied upon heavily by the Easley Defendants, the plaintiff brought a claim under the CFAA against its former vice president. No. 08-4824, 2008 WL 5244818 (D. Minn. Dec. 15, 2008). The vice president argued that his position inherently provided him with authorized access to the plaintiff's computer system, including access to confidential business information stored therein, and he was thus unable to have acted without authorization or in excess of authorized access in violation of the CFAA. *Id.* at *4. In response, the plaintiff contended that the vice president was without authorization or exceeded his authorized access because he was not authorized to access the computer system "to misappropriate confidential business information for his personal competitive use." *Id.*

In analyzing the issue, the *Condux* court collected numerous cases on both sides of the "unauthorized access" versus "authorized access, but improper use" debate: one line providing for liability when a defendant "accesses confidential or proprietary business information from his employer's computers that he has permission to access but then uses that information in a manner that is inconsistent with the employer's interests or in violation of contractual obligations or

5

fiduciary duties" (the *Shurgard/Citrin* line of cases), and another holding that "the CFAA is implicated only by the unauthorized access, obtainment, or alteration of information, not the misuse or misappropriation of information obtained with permission" (the *Lockheed* line of cases).[5]  *Id.* at *4 & nn. 3 & 4.  Adopting the latter view, the *Condux* court analyzed the statute's plain language, legislative history, and the pragmatic result that would ensue if it were to have decided otherwise.  *Id.* at 4-6.  In the words of the court in *Condux*, to allow a CFAA claim to proceed under the authorized, but improper use theory "would create a federal cause of action for an employer whenever an employee accesses information on the company computer with intentions of using the information in a manner adverse to the employer's interests . . . ."  *Id.*  at 6.  That is to say, providing for liability under such a theory would essentially equate a breach of duty of loyalty to an employer with a violation of the CFAA.  The *Condux* court, along with the many others which it cited, expressly chose to reject such an expansive reading of the CFAA.  *Id.*

Recently, and on facts similar to those present in *Condux*, a district court in this circuit came to an identical conclusion.  In *Bridal Expo, Inc. v. Van Florestein*, two of the plaintiff's former employees used much of the plaintiff's business information to start a competing entity.  No. 4:08-cv-03777, 2009 WL 255862, at *1 (S.D. Tex. Feb. 3, 2009).  Late in the afternoon of the former employees' final day of work, the defendants downloaded a substantial amount of business information that was used to advertise to and solicit business from the plaintiff's customer base.  Just as in *Condux*, the parties in *Bridal Expo* advocated for opposing views of the "unauthorized access"

---

[5] As identified by the *Condux* court, the former line of cases—the "authorized access, but improper use" view—is rooted in *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006) and *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121 (W.D. Wash. 2000). The latter line of cases—the "unauthorized access" view—is derived from *Lockheed Martin Corp. v. Speed*, No. 6:05-cv-1580, 2006 WL 2683058 (M.D. Fla. Aug. 1, 2006).

versus "authorized access, but improper use" debate.  *Id.* at *10-11.  Acknowledging the *Shurgard/Citrin* line of cases, the *Bridal Expo* court ultimately adopted the reasoning and conclusions set forth in *Lockheed* and *Condux*.  As stated by Judge Ellison, "given the persuasive arguments in *Lockheed*, and the rule of lenity, given that the CFAA is also a criminal statute, the Court declines to read the CFAA to equate 'authorization' with a duty of loyalty to an employer . . . ." *Id.* *11.[6]

With the above described split in mind, the Court need not repackage the analysis provided in *Lockheed*, *Condux*, *Bridal Expo*, or the other cases sharing their view.  For the reasons set forth in the above-cited cases,  the Court concludes that to establish a claim under § 1030(a)(4), a plaintiff must show that a defendant obtained unauthorized access to computer data.  The mere misuse of information to which a defendant had authorized access is not enough.  When applied to facts revealed by the record in this case, it is evident that Pratt has not preserved a genuine issue of material fact as to its CFAA claim.

---

[6] The *Bridal Expo* court also distinguished a recent Fifth Circuit case interpreting and applying a CFAA provision similar to § 1030(a)(4). In *United States v. Phillips*, the defendant was charged with stealing private information from the University of Texas through a program designed to gain access to a university database by randomly entering social security numbers into the log-in screen until access was granted. 477 F.3d 215, 218-19 (5th Cir. 2007). The defendant was ultimately convicted under §§ 1030(a)(5)(A)(ii) & 1030(a)(5)(B)(i) of the CFAA. The *Phillips* court upheld the conviction, citing with approval—but not directly relying upon—several of the cases adopting the "authorized access, but improper use" approach discussed above.

When evaluating whether the defendant's access was authorized, the Fifth Circuit applied an analysis rooted in a 1991 case from the Second Circuit which focused on whether the access was within the "expected norms of intended use" or within the "nature of the relationship established between the computer owner and the user." *Id.* at 219-20 (citing *United States v. Morris*, 928 F.2d 504 (2d Cir. 1991)).  In applying the Second Circuit approach, however, the *Phillips* court did not expressly state which view of the "unauthorized access" versus "authorized access, but improper use" issue is law of the circuit. In other words, "the Fifth Circuit [did] not explicitly hold that either line of cases is appropriate." *Bridal Expo*, 2009 WL 255862 at *10 n.9.  Like the court in *Bridal Expo*, this Court does not deem *Phillips* to be dispositive as to Pratt's CFAA claim. Moreover, with the Second Circuit's "intended use" analysis in mind, the Court concludes that it was within the nature of Doane and Turner's working relationship with Pratt that the two employees were permitted to use their computers freely and access the business information underpinning this dispute.  Unlike in *Phillips*, here, there is no evidence that any defendant manipulated Pratt's computers to gain access to information they were not otherwise authorized to view.

It is undisputed that Doane and Turner, by way of their positions at Pratt, had authorized access to Pratt's computer system and the business information stored therein.  (Dkt. No. 54, Ex. 3 at 12 (indicating that Doane and others were authorized to access Pratt's computers)).  Just as in *Condux* and *Bridal Expo*, the only claim then is that the subsequent misuse of that information should give rise to the potential for civil liability.  (Dkt. No. 17 ¶¶ 36, 53, 69 (alleging that based on Doane's authorized access, but subsequent misuse, Doane misappropriated Plaintiff's purportedly proprietary information)).  However, as stated, such facts do not give rise to a claim under § 1030(a)(4).  It was entirely within the nature of their relationship for Doane and Turner to use Pratt's computers and access the information at issue here.  The subsequent use of such information for competitive purposes does not provide for liability under the CFAA.  Therefore, summary judgment as to Pratt's CFAA claims is hereby granted.

## B.  State Law Claims

Because the dismissal of Pratt's CFAA claim disposes of the last claim that provided the Court with original jurisdiction, a discussion of supplemental jurisdiction is warranted.

A district court may decline to exercise supplemental jurisdiction if it has dismissed all the claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). Although the general rule in the Fifth Circuit "is to dismiss state claims when the federal claims to which they are pendent are dismissed[,]" *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir.1992) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir.1989)); *see also Priester v. Lowndes County*, 354 F.3d 414, 425 (5th Cir. 2004), the Supreme Court has counseled that district court's should examine factors such as economy, convenience, fairness, federalism, and comity in determining whether jurisdiction should be exercised. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

8

Because the Court has had substantial involvement with this case for more than two years and there is an absence of complex or as yet untested issues of state law, the Court finds that it would be in the best interests of the Parties and justice for the Court to exercise supplemental jurisdiction over the remaining state claims.

**C.  Pratt's Claim of Misappropriation of Trade Secrets**

To successfully bring a claim of trade secret misappropriation pursuant to Texas law, a plaintiff bears the burden of establishing (1) the existence of a trade secret; (2) that the defendant acquired the trade secret through either a breach of a confidential relationship or other improper means; (3) that, without the plaintiff's permission, the defendant used the trade secret; and (4) damages. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 149-50 (5th Cir. 2004); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991).   The Easley Defendants have challenged the existence of the first, second, and fourth elements, which the Court will analyze in turn.

**1. Existence of a Trade Secret**

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). Pratt has alleged that both its customer lists and various customer data are protected trade secrets.  Specifically, Pratt claims the client information that should be characterized as a trade secret includes the list of customers itself, as well as "five years' worth of policy information, including loss histories, past insurers and coverages, employee names and driver's license information (including dates of birth), vehicle lists and VIN numbers,

building location and structural data (including the size, age, age of roof, type of structure, etc.) and much more." (Dkt. No. 56 at 4; Dkt. No. 56, Ex. B).

When determining whether a trade secret exists, courts are to apply the Third Restatement of Tort's six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Lee*, 379 F.3d at 150 (citing *In re Bass*, 113 S.W.3d at 739-40) (incorporating the test set forth by Restatement (Third) of Unfair Competition § 39 reporter's n. cmt. d); *see also Carbo Ceramic, Inc. v. Keefe*, 166 Fed. App'x 714, 718 n.1 (5th Cir. 2006).

"'[B]ecause trade secrets do not fit neatly into each factor every time,'" *Lee*, 379 F.3d at 150 (quoting *In re Bass*, 113 S.W.3d at 740), the party claiming a trade secret need not satisfy all six factors. Indeed, the Texas Supreme Court has observed that because it is impossible to "state precise criteria for determining the existence of a trade secret," a reviewing court must proceed though a full-factor analysis, which includes considering the "value, secrecy, and definiteness of the information *as well as the nature of the defendant's conduct*." *In re Bass*, 113 S.W. 3d at 739 (emphasis added) (quoting Restatement (Third) of Unfair Competition § 39 reporter's n. cmt. d). However, the overarching burden on the party claiming secrecy status is to show that the information underlying the dispute was secret. *Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 99 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Customer lists, pricing

10

information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets. *See Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied) (citing *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, no pet.)).

Although customer lists may be considered trade secrets, "not all customer lists are trade secrets under Texas law." *Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003). "The broader rule of trade secrets, that they must be *secret*, applies to customer lists. A customer list of readily ascertainable names and addresses will not be protected as a trade secret." *Id.* Accordingly, courts look to three factors when determining whether a customer list is a trade secret: "(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable." *Id.* Although the factors used to determine whether a customer list is a trade secret overlap to some extent with those used in analyzing trade secrets generally, the parties have, at least in part, addressed the two categories separately, and other courts have segregated the evaluation. *See, e.g.*, *id.* at 467-69. Thus, to the extent the categories are distinguishable, the Court will first determine whether the customer list itself is a trade secret and then proceed to discuss the various other information obtained by the Easley Defendants.

### a. Customer List

Pratt has shown that it took steps to maintain the confidentiality of its customer lists. While Pratt employees did have access to customer files and "producer statements," which contained basic information such as customer names, policy numbers, policy expiration dates, premiums paid, and commissions received, (Dkt. No. 54, Ex. 1 at 30-32; Dkt. No. 54, Ex. 2 at 9; Dkt. No. 56, Ex. B),

Pratt did not provide a list of its customers to nonemployees, (Dkt. No. 56, Ex. B). In fact, Pratt took steps to secure this information from nonemployees. (*Id.*).

Pratt has also produced evidence that tends to show that a departing employee would acknowledge the customer list as confidential. Pratt employees were provided a copy of Pratt's employee manual that described Pratt's "customer lists" as trade secrets. (*Id.*; Dkt. No. 56, Ex. 1). Moreover, Doane's behavior in copying the names of customers under cover of darkness without her employer's knowledge suggests that she thought the information, which included the names of customers—even though she already possessed this information in the form of producer statements—was confidential. Additionally, when the evidence is viewed in the light most favorable to Pratt, the evidence suggests that the list of customers that Doane possessed in the form of producer statements was not intended for use outside of Doane's employment with Pratt.

Last, Pratt has offered evidence tending to show that the customer lists were not readily ascertainable to non-Pratt employees. Pratt has shown that it maintained a separate waiting area for customers and others not employed by Pratt to prevent them from accessing Pratt's files and kept its offices locked after hours. (Dkt. No. 56, Ex. B). Pratt has also shown that information about its clients, including customers' names, took Pratt "thousands of hours to accumulate at a cost . . . of several hundred thousand dollars. (*Id.*). Moreover, Pratt's customer list could not be obtained by calling a readily identifiable group of individuals. *See Research Equip. Co. v. C.H. Galloway & Scientific Cages, Inc.*, 485 S.W.2d 953, 956 (Tex. App.—Waco 1972, no writ) (finding prospective purchasers of animal cages for research animals a well-defined class ascertainable from nonemployer sources); *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App.—Forth Worth, no writ) (finding business engaged in selling and leasing diagnostic imaging equipment could readily

obtain customer lists by calling doctors and hospital administrators). Pratt sold insurance to businesses and individuals—anyone in the state of Texas could have been a potential customer. Accordingly, the customer list was not "readily ascertainable from sources *other* than the employer's records." *Gaal v. BASF Wyandotte Corp.*, 535 S.W.2d 152, 155 (Tex. App.—Houston [14th Dist.] 1976, no writ); *see Sautter v. Comp Solutions Network, Inc.*, No. 14-98-00555-CV, 1998 WL 802481, at *4-5 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (trial court's conclusion that customer list of niche insurance agency that was not readily available from an outside source was a trade secret was not an abuse of discretion).

Pratt has presented enough evidence to find that the customer list is a trade secret.

### b. Other Customer Data

The first Restatement factor, the extent to which the information is known outside the plaintiff's business, and the sixth restatement factor, the ease or difficulty with which the information could be properly acquired or duplicated by others, are closely related and will be analyzed together. The Easley Defendants contend that because Doane and Turner were the producing agents who wrote insurance for the former Pratt customers at issue here, they would have had little trouble collecting the information anew. On the other hand, Pratt maintains that, although Doane and Turner may have *eventually* gathered the information, it would have likely taken months, perhaps years, and not the few nights they spent copying Pratt's files. The Court agrees with Pratt. It strikes the Court as evident that while Doane and Turner may have, after some time, acquired the information contained in the copied documents, the rate at which they would have obtained the information would have been different had they not taken possession of the copied documents underlying this dispute. The precise time saved by the Easley Defendants is not essential to this

determination; rather, it is sufficient to say that it would undoubtedly have taken much more time to recompile the relevant information than it did to merely photocopy it. This would have, in turn, lengthened the time in which the Easley Defendants, or any other party outside of Pratt's agency, could have solicited business from Pratt's former customers. Accordingly, the first and sixth factors weigh in favor of finding that the documents contained trade secrets.

The second Restatement factor, the extent to which the information at issue is known by employees and others involved in the business, also weighs in favor of finding a trade secret exists. While the information at issue was accessible by Pratt employees, (Dkt. No. 56, Ex. B), the information contained in the copied documents was not known by all of those Pratt employees—and it certainly was not known to them in the easy-access form of the documents copied by Doane. The record reveals that the documents copied by Doane included "[f]ive years' worth of policy information, including loss histories, past insurers and coverages, employee names and drivers license information (including dates of birth), vehicle lists and VIN numbers, building locations and structural data (including, age, age of roof, type of structure, etc.) and much more." (Dkt. No. 56 at 4; Dkt. No. 56, Ex. B). This is more than the information the Defendants possessed in the form of producer statements, which included "the customer and client name, the class of business, the transaction, the effective date, the expiration date, the invoice amounts, the agency commission, the agent commission, . . . [the] [p]roducer commission and producer percentage of commission, [and] the policy number." (Dkt. No. 54, Ex. 1; Dkt. 54, Ex. 2). Because the information was not known by Pratt employees and others involved in the insurance business—even though the information was available to them—the Court finds that the second factor weighs in favor of finding trade secrets existed in the documents.

14

The third consideration identified by the Restatement, the extent of measures taken to safeguard the secrecy of the information, weighs in favor of finding that the information is subject to trade secret protection. Pratt foreclosed access to this information to those outside of its business, (Dkt. No. 56, Ex. B) (stating that "non-employees were never allowed unescorted access to the area where our client files are maintained"), and kept its offices locked after hours, (*Id.*). Moreover, Pratt provided all of its employees with an employee manual describing the information taken by Doane as "trade secrets." (*Id.*). Therefore, the Court finds that this factor weighs in favor of finding trade secret protection.

The fourth Restatement factor, the value of the information to Pratt and to its competitors, favors finding the data to be a trade secret.  The record shows that this information is valuable in that it aids in the targeting, solicitation, and underwriting of potential insurance clients.  Indeed, it appears that this information constitutes "the most valuable asset" of an insurance agency.  (Dkt. No. 56, Ex. C).  Accordingly, the Court finds that this factor weighs in favor of finding the documents contain trade secrets.

The fifth Restatement factor, the amount of effort or money expended in developing the information, also favors finding the information to be a trade secret.  The record shows that the information Doane copied was "obtained through months and often years of work from [Pratt's] agents . . . ."  (Dkt. No. 56, Ex. B at 2).  Additionally, the "totality of the documents pirated took [Pratt] thousands of hours to accumulate at a cost to [Pratt] of several hundred thousand dollars." (*Id.*).  Therefore, the fifth Restatement factor weighs in favor of finding that trade secrets existed in the documents.

Finally, the surrounding circumstances give credence to the notion that this information

should be granted trade secret status. The most glaring circumstance, and the fact the Court believes might be the most relevant to this determination, is the nature of Doane's behavior in obtaining the documents and the information contained within.  Instead of politely asking for copies of documents to which she might have felt entitled, or compiling the information in an open and straightforward manner, Doane took a entirely different tactic. In the days—or perhaps more accurately stated, nights—prior to her leaving Pratt, Doane copied the relevant client documents and discretely secreted them from her former employer's establishment.  (Dkt. No. 56, Ex. A at  43-46). Differently stated, under the cover of darkness and a shroud of secrecy, Doane took Pratt's files. By this measure alone, it appears clear that at least Doane was under the impression the documents were considered highly valuable and secret.  Although the Easley Defendants attempt to explain away Doane's highly suspicious behavior, (Dkt. No. 54 at 2), their explanation does not negate the evidence put forward by Pratt showing that Doane did take information from her employer under improper circumstances.  Doane's own actions heavily bolster the conclusion that the information should be considered a trade secret.

In sum, Pratt has produced competent evidence showing that all of the Restatement factors favor the conclusion that the files at issue should be treated as trade secrets.  Moreover, even if they did not, the record shows that Doane's behavior stands squarely on the side of finding that the information she took is a trade secret.  Therefore, the Court concludes that there is sufficient evidence that the information taken by Doane is a trade secret.

### 2. Breach of Confidential Relationship or Other Improper Means

Texas follows the rule that one is liable for disclosure of trade secrets if (1) he discovers the secret by improper means or (2) his disclosure constitutes a breach of confidence.  *Mercer v. C.A.*

16

*Roberts Co.*, 570 F.2d 1232, 1238 (5th Cir. 1978).

### i. Improper Means

A person is liable for using a trade secret if he discovered the secret by improper means. *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 769 (Tex. 1958). "Improper means of acquiring another's trade secrets include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Astoria Industries of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 636 (Tex. App.—Fort Worth 2007, pet. denied) (citing Restatement (Third) of Unfair Competition § 43).

As previously discussed, the record shows that Doane and her accomplices surreptitiously copied 4,000 pages of Plaintiff's client files after hours and without Pratt's knowledge. The Court finds that this is sufficient evidence to show that Defendants' conduct was accomplished by "improper means." However, even if it did not, Defendants' disclosure was a violation of a confidential relationship with Pratt.

### ii. Confidential Relationship

An express contractual provision is not required to establish a duty of confidentiality, although a court may consider the absence of such a provision. *Hollomon v. O. Mustad & Sons (USA), Inc.*, 196 F. Supp. 2d 450, 459 (E.D. Tex. 2002). "The law will imply as part of the contract of employment an agreement not to disclose information which the employee receives as an incident of his employment, if the employee knows that his employer desires such information kept secret, or if, under the circumstances, he should have realized that secrecy was desired." *Lamons Metal Gasket Co. v. Traylor,* 361 S.W.2d 211, 213 (Tex. App.—Houston 1962, writ ref'd n.r.e.).

Here, Plaintiff has presented evidence that Doane knew or reasonably should have known that the information she copied was considered a trade secret by Pratt and that Pratt wanted that information kept secret.  The Employee's Manual that Doane admits to having received describes the information in question as "trade secrets" and states, in no uncertain terms, Pratt's desire to have its information kept secret.  (Dkt. No. 56, Ex. 1; Dkt. No. 56, Ex. A at 18-20). Therefore, even if the information was not discovered by improper means, the record provides evidence tending to show that the disclosure was a breach of confidence.

### 3. Damages

A plaintiff must show that it suffered damage as a result of a defendant's conduct.  While "damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *DSC Commc'ns Corp. v. Next Level Commc'ns* 107 F.3d 322, 329-30 (5th Cir. 1997).

Pratt has come forward with evidence of its lost profits, and those profits have been calculated using reasonable assumptions and respected sources.  (Dkt. No. 56, Ex. B; Dkt. No. 56, Ex. 3).

However, as Pratt correctly notes, lost profits is not the only measure of damages available to Pratt.  Other appropriate measures of damages include the value gained by the defendants and the market value of the trade secrets. *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986); *Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263-64 (5th Cir. 1970).  When a plaintiff seeks damages measured by what a "reasonable royalty" would have been for the use of the trade secrets, it is proper for the trier of fact to consider many

18

factors, including "the prices past purchasers or licensees may have paid" and "the total value of the secret to plaintiff, including the plaintiff's development cost and the importance of the secret to plaintiff's business . . . ."  *Metallurgical Indus. Inc.*, 790 F.2d at 1208.  When utilizing the "market value" measure of damages, the trier of fact can measure damages based upon what a reasonably prudent investor would have paid for the trade secret.  *Precision Plating*, 435 F.2d at 1263-64.

Pratt has produced evidence showing the value of the information copied by Doane, (Dkt. No. 56, Ex. B; Dkt. No. 56, Ex. 3; Dkt. No. 56, Ex. C),  it's importance, (Dkt. No. 56, Ex. C), and the amount of time it took them to develop this information, (Dkt. No. 56, Ex. B).  Accordingly, summary judgment is not appropriate.

**D. Pratt's Breach of Fiduciary Duty Claim**

The Easley Defendants next contend Plaintiff failed to state a claim for breach of fiduciary duty.  To establish a breach of fiduciary duty claim, a plaintiff must show: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach caused an injury to the plaintiff or benefit to the defendant.  *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 743 (Tex. App.—Dallas 2007, pet. denied).  During their employment, employees owe a fiduciary duty to their employer and are obligated to act for their employers' interests.  *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201-02 (Tex. 2002).  During employment and after termination, employees may not divulge their employers' trade secretes even if they are not bound by confidentiality agreements.  *Id.* at 201-02.

Defendants' summary judgment motion rests on the assertion that no trade secrets were divulged, and therefore no breach occurred.  Because there is evidence to suggest that the copied

documents did contain trade secrets, summary judgment on Pratt's breach of fiduciary duty claim is not appropriate.

**E. Pratt's Breach of Contract Claim Against Turner**

 To bring a breach of contract action, a plaintiff must establish the following elements: (1) a valid enforceable contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the defendant's breach was the cause of plaintiff's injury. *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 713 (Tex. App.—Corpus Christi 2006, pet. denied).

"When a party materially breaches a contract, the other party may treat the contract as ended and cease performance. Thus, a party who fails to perform his obligation may not thereafter enforce the remaining terms of the contract against the other party." *Interceramic, Inc. v. South Orient R.R. Co., Ltd.*,  999 S.W.2d 920, 924 (Tex. App.—Texarkana 1999, pet. denied).

Additionally, a written contract that *is not required by law to be in writing* may be modified by a subsequent oral agreement, even though the contract provides that it can be modified only by a written agreement.  *Am. Garment Props., Inc. v. CB Richard Ellis-El Paso, L.L.C.*, 155 S.W.3d 431, 435 (Tex. App.—El Paso 2004, no pet.).   Therefore, if the contract is not subject to the Statue of Frauds, an agreement that contains a no-oral-modification clause can be orally modified.  *Id.*; *Double Diamond, Inc. v. Hilco Elec. Coop., Inc.*, 127 S.W.3d 260, 267 (Tex. App.—Waco 2003, pet. denied).  However, oral modification is not permitted if the contract is subject to the Statue of Frauds.

The Statute of Frauds provides that an agreement which is not to be performed within one year from the date of the making of the agreement must be in writing to be enforceable. Tex. Bus.

20

& Com. Code Ann. § 26.01(b)(6) (Vernon 2009). In Texas, "when an oral contract for lifetime employment is made, the understanding and intention of the parties is for the term of such a contract to last beyond one year." *Royle v. Tyler Pipe Indus.*, Inc., 6 S.W.3d 593, 595 (Tex. App.—Tyler 1999, pet. denied); *Massey v. Houston Baptist Univ.*, 902 S.W.2d 81, 84 (Tex. App.—Houston [1st Dist.] 1995, writ denied) ("The promise of permanent or lifetime employment, or the promise of employment until retirement age, is the type of employment contract that must be reduced to writing to be enforceable."). The "'nature of the performance expected' under a contract for lifetime employment compels the conclusion that the expected duration of such an agreement is longer than one year. . . . . Thus, such a contract is within the Statute of Frauds and requires a writing to be enforceable." *Royle*, 6 S.W.3d at 595 (citations omitted).

Easley Defendants claim that Pratt was the first party to breach the Producer's Agreement by failing to pay Turner $1,000 per month.[7] Pratt "admits that there is no written agreement altering the compensation provision," and states that "it was Ms. Turner who asked that she be provided with the additional employee assistance in lieu of the $1,000 per month." (Dkt. No. 58 at 7). Because Pratt admits that the $1,000 per month due Turner was not paid, and because the contract was "for a period consisting of the entire lifetime of Producer," (Dkt. No.54, Ex. 9)—and therefore falls within the Statute of Frauds—Pratt's evidence of an oral modification cannot save its claim from summary judgment. Evidence of an oral modification is not permitted because the employment

---

[7] The Easley Defendants also claim that Pratt breached the Producer's Agreement by prohibiting Turner from selling commercial policies unless she received express permission from one of the partners. While the Producer's Agreement does not expressly permit Turner to sell commercial policies and states that Turner is "subject to [the] general contractual direction of the agency," (Dkt. 54, Ex. 9), it is not necessary to determine whether summary judgment is proper on this ground, as the failure to pay Turner $1,000 per month precludes the breach of contract claim from moving forward.

21

contract falls within the Statute of Frauds.[8]  Accordingly, summary judgment is granted on the breach of contract claim.

**F. Tortious Interference with Contract Claim**

In order to establish a claim of tortious interference with contract, a plaintiff mush show (1) a contract subject to interference exists; (2) the alleged act of interference was willful and intentional; (3) the willful and intentional act proximately caused damage; and (4) actual damage or loss occurred.  *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

Pratt has failed to point to any evidence of a contract.  In its Response to the Easley Defendants' Supplemental Motion for Partial Summary Judgment, Pratt limited its response to pointing out that the "state law cited by the Easley Defendants is not in any way controlling over this Honorable Court," (Dkt. No. 94 at 3), without pointing to evidence of a contract.

The only summary judgment evidence offered for consideration on the existence of a contract—which appeared in the form of exhibits to the Easley Defendants' Supplemental Motion for Partial Summary Judgment—cannot establish that a contract existed.  In its answer to an interrogatory from Doane about the contracts allegedly interfered with, Pratt stated that

> At this point, only one or more of the Defendants know for certain all of the contacts of Plaintiff which were victimized by Defendants' tortious interference.  Similarly, only the Defendants know the identity of the 3,500 pages of Plaintiff's files wrongfully copied by Defendant Doane.  However, Exhibit "B" shows Plaintiff's clients who were serviced by Ms. Doane and Ms. Turner.  As can be seen by comparing year 2004 (Ms. Doane's last <u>full</u> year with Plaintiff) with the following years, most of those clients left immediately or shortly after her departure.  Pratt believes it likely that Defendants tortiously interfered with <u>**all**</u> of the clients (contracts) shown in those producer's statements.  We are in the process of trying to seek that information through the

---

[8]"Not every oral modification to a contract within the Statute of Frauds is barred. . . . The critical determination is whether the modification materially effects the obligations of the underlying agreement. . . . Where the character or value of the underlying agreement is unaltered, oral modifications are enforceable." *Am. Garment Props., Inc.*, 155 S.W.3d at 437.  In this case, the oral modification asserted by Pratt would materially alter the parties' written agreement.

discovery process at this time.  To the extent that we can prove a conspiracy, then all
parties to that conspiracy are guilty of the tortious interference of Defendant Doane
(and/or Turner).

(Dkt. No. 91, Ex. 1, at 5).  The only other summary judgment evidence on this issue is the "Exhibit

B" mentioned above.  "Exhibit B," titled "Producer Statement Detail," includes the names of clients,

clients' insurance effective and expiration dates,[9] invoice amounts, agency commission amounts,

etc.  (Dkt. No. 91, Ex. 2).  However, this evidence does not tend to show that any contracts existed

between Pratt and its clients, what the obligations were under the supposed contracts, or when those

contracts began and expired.  *All Am. Tel., Inc. V. USLD Commc'n*, No. 2-08-092-CV, 2009 WL

1996291, at *9-10 (Tex. App.—Fort Worth July 9, 2009) (evidence that did "not provide any further

detail as to specific terms or even the general legal effect of such contracts, nor . . . any executed or

nonexecuted contract to serve as an exemplar of such contracts' provisions" was not enough

evidence to survive summary judgment on a tortious interference with contract claim).  Pratt has

only alleged that the Defendants interfered with their clients, not their contracts. *Id.* at *10 ("General

claims of interference with a business relationship are insufficient to establish a tortious interference

with contract claim.").  Because Pratt cannot show any evidence of a contract, summary judgment

on this claim is appropriate.

**G. Tortious Interference with Prospective Contract or Business Relations Claim**

To prevail on a claim for tortious interference with prospective contract, the plaintiff must

establish (1) a reasonable probability the parties would have entered into a contractual relationship;

(2) an "independently tortious or unlawful" act by the defendant preventing the relationship from

occurring; (3) the defendant performed such act with a conscious desire to prevent the relationship

---

[9]Pratt does not contest the Easley Defendants' statement that the effective and expiration dates refer to the
"customers' insurance contracts with their insurance carriers."  (Dkt. No. 91 at 6).

from occurring, or he knew the interference was certain or substantially certain to occur as a result of the defendant's conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.  *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414-15 (Tex. App.—Waco 2001, pet. denied).

The Easley Defendants assert that Pratt is not able to prove the second element, as, they state, "there is no recognized tort under which the Easley Defendants' conduct would be actionable." (Dkt. No. 91 at 10).  Because the Court finds that Pratt's trade secret and breach of fiduciary duty claims survive summary judgment, the Easley Defendants' motion for summary judgment on this claim is denied.

## CONCLUSION

The Court rules as follows:

1.    Defendants' motion for summary judgment as to Plaintiff's CFAA claim is GRANTED.

2.    Defendants' motion for summary judgment as to Plaintiff's misappropriation of trade secrets claim is DENIED.

3.    Defendant's motion for summary judgment as to Plaintiff's breach of fiduciary duty claim is DENIED.

4.    Defendants' motion for summary judgment as to Plaintiff's breach of contract claim is GRANTED.

5.    Defendants' motion for summary judgment as to Plaintiff's claim for tortious interference with contract is GRANTED.

6.    Defendants' motion for summary judgment as to Plaintiff's claim for tortious

interference with prospective contract or business relations is DENIED.

7.      Defendants' Objections to Plaintiff's Summary Judgment Evidence (Dkt. No. 59) is OVERRULED to the extent the Court has regarded portions of the evidence as admissible and necessary to resolve summary judgment issues.  The remaining objections are DENIED as moot.

It is so ORDERED.

Signed this 25th day of September, 2009.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

25